THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:08-CR-217-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM & RECOMMENDATION** |
| RAY DELOYETTE DALLAS ) | |
| ) | |
| Defendant ) | |
| ) | |

This matter is before the court on Defendant Ray Deloyette Dallas' ("Dallas") motion to suppress evidence seized during a search of a vehicle, driven but not owned by, Dallas. [DE-15]. The government has responded, [DE-16], and submitted two supplemental briefs, [DE-20 & 27]. Defense counsel also filed a supplemental brief. [DE-24]. The court held an evidentiary hearing on December 15, 2008, to develop the record. At the December 15, 2008 hearing, the court heard testimony from Detective Adam Troy Brinkley, a member of the Cumberland County Sheriff's Department, who was in charge of the investigation and subsequent arrest of Dallas, Detective Melissa Hill, a member of the Cumberland County Sheriff's Department, who was also involved in the arrest of Dallas, and Detective Dustin John Ramsden, a Crime Scene Investigator ("CSI") for the Cumberland County Sheriff's Department when Dallas was arrested, who performed the search of the car driven by Dallas and collected evidence at the scene of the shooting. In addition, Brandy Dallas ("Brandy"), Dallas' niece, testified. Accordingly, this matter is ripe for review.

**STATEMENT OF THE FACTS**

A. Detectives Brinkley and Hill

1

The facts largely are not disputed. Detectives Brinkley and Hill testified to the following facts: In the early morning hours of January 11, 2008, Detectives Brinkley and Hill responded separately to a report of a shooting in the parking lot of a gas station in Fayatteville, North Carolina. On his way to the scene, Detective Brinkley made phone contact with Detective Hill, who was at the scene, and learned that the victim of the shooting, Jack Blackwell Sr., was at the hospital. Detective Brinkley went immediately to the hospital to check on Blackwell Sr.'s status. Blackwell Sr. was being treated for a gunshot wound to the leg. He was intoxicated, however, he told Detective Brinkley that his brother, Dallas, had shot him. Detective Brinkley then went to the crime scene to make sure that it was secure. When Detective Brinkley arrived, Detective Hill was interviewing Jack Blackwell Jr., the son of Jack Blackwell Sr. and nephew of Dallas, who was with Dallas and Blackwell Sr., that evening and early morning and witnessed the shooting. Detective Brinkley proceeded to interview an individual who witnessed some of the fight between Blackwell Sr. And Dallas. The witness stated that he was driving his daughter to work when he saw two individuals arguing in the parking lot, and someone trying to break up the fight. When he came back from dropping his daughter off at work, he saw someone on the ground, and another person standing over him. Blackwell Jr. approached the witness and asked him to call 911, which the witness did.

Meanwhile, Detective Hill interviewed Blackwell Jr. Blackwell Jr. stated that he was with his father Blackwell Sr., and his uncle Dallas, at his grandmother Nettie Dallas' ("Nettie") house on the night of January 10. They were drinking. They waited until Nettie fell asleep, then Dallas took her keys. The three got into her 2000 Hyundai Accent GL, and drove to Brandy's house. They asked Brandy if they could have some gas money and she

gave them five dollars. They also went to the back of Brandy's house, where there were abandoned vehicles. Dallas knew that there were two rifles hidden in an abandoned vehicle on Brandy's property. Dallas retrieved the rifles so that they could trade the weapons for crack cocaine in an area called Massey Hill, which is a high crime and drug area. The three put the rifles in the Hyundai and drove to the gas station in order to pick up more beer. While at the gas station a fight broke out between Dallas and Blackwell Sr., who did not want to go to Massey Hill to sell the rifles. During the fight Dallas took one of the rifles out of the car and shot Blackwell Sr. in the leg. He then put the rifle back in the car and drove off, leaving Blackwell Sr. and Blackwell Jr. at the gas station. Blackwell Jr. thought that Dallas might have gone back to Nettie's house or to Brandy's house. Detective Hill relayed the information she received from Blackwell Jr. to Detective Brinkley.

Detective Hill put a "Be on the Lookout" notice over her radio with Dallas' information and noting that he was armed and dangerous, based on Blackwell Jr,'s statement that Dallas left the scene of the shooting with the rifles. Detective Brinkley learned that Dallas did not have a valid driver's license.

Detective Brinkley and Detective Hill then drove to Brandy's house. They noticed a 2000 Hyundai Accent GL parked in front of Brandy's home–nobody was inside the car. They knocked on the door. Brandy answered. Detective Brinkley stated that they were looking for Dallas and she told the detectives that he was in her home. She agreed to let the detectives inside and told them about the weapons that she had in her home. None of the weapons that Brandy described matched the rifles for which Detective Brinkley was looking. Brandy showed the detectives to the room in which Dallas was located. He was lying face down on the bed. Detective Brinkley called Dallas' name, and asked him to

3

show his hands. Dallas did not respond. Detective Brinkley went into the bedroom and stablized Dallas' hands. He noticed that Dallas had injuries to his abdomen and shoulder, indicating that he had been stabbed. This was the first time that the detectives learned that Dallas had been injured in the fight with Blackwell, Sr. Detective Brinkley called paramedics, who transported Dallas to the hospital. Detective Hill stated that she walked with Dallas to meet the paramedics and that he told her that the rifles were located in the trunk of the Hyundai and that Brandy would help her locate them. At the time of the search, Detective Hill did not tell Detective Brinkley that Dallas had told her that the rifles were in the trunk because she thought that Detective Brinkley knew that Dallas had said the rifles were in the trunk. Detective Hill testified that she thought Brandy might have heard Dallas say that the rifles were in the trunk of the Hyundai and that Brandy would help the detectives find them. The first time that Detective Hill noted the fact that Dallas told her where the rifles were located was in a report filed five months after the incident took place.

After Dallas was transported to the hospital, Detective Brinkley went to the Hyundai. He noticed that the driver-side door was slightly ajar. He also noticed that there was some blood splatter on the trunk and the driver-side door handle. CSI Ramsden came to the scene. He took pictures before anyone entered the vehicle. Then CSI Ramsden searched the vehicle at Detective Brinkley's request. CSI Ramsden found two rifles in the trunk of the Hyundai and a white sweatshirt with blood on it and slash marks through it.

Detective Brinkley did not obtain a warrant to search the Hyundai. He was going to have the Hyundai seized, however Brandy told him that the vehicle belonged to Nettie, Dallas' mother. Detective Brinkley testified that Brandy told him that the Hyundai was Nettie's only form of transportation and she requested that he leave the car. Accordingly,

4

he had CSI Ramsden process the vehicle on site and leave it so that Nettie could use it.

Detective Brinkley then went to the hospital. Dallas was treated and released into police custody. Detective Brinkley interviewed Dallas after he was released from the hospital. Dallas admitted that he shot Blackwell Sr. after Blackwell Sr. stabbed him numerous times. Dallas also stated that he lived with his mother, Nettie.

### B. Detective Dustin John Ramsden

Detective Ramsden testified that he conducted the search of the Hyundai and had done so on Detective Brinkley's orders. The parties agreed to stipulate to the information found in his report, which detailed his actions in searching the car, and also an inventory of the objects removed from the car, including two rifles. Detective Ramsden also testified that the Hyundai was unlocked, and the driver's door was slightly ajar.

### C. Brandy Dallas

Brandy Dallas also testified at the December 15, 2008 hearing. She stated that Nettie is 82 years old and had a large cyst on her hand that required surgery in December 2007. Nettie was in a lot of pain and could not use her hands much in January 2008, and that Dallas would take care of her and drive her where she needed to go. She stated that Dallas does not have his own home, but splits his time living with her and Nettie. She said that he keeps personal items, such as a toothbrush and clothes in both houses. When he is with Nettie he drives her to doctor's appointments, and to run errands.

She stated that Dallas, Blackwell Jr. and Blackwell Sr. came to her house at around 4:00 am on January 11, 2008. They were at her house for approximately five minutes. She did not see them go into her backyard. She has six pit bull dogs that she keeps chained in her backyard and she said she would hear them barking if someone went into

5

her backyard, but she did not hear the dogs bark after Dallas left her house. Around 7:00 am, Dallas returned to her house; he said he was tired and that Blackwell Sr. had "cut" him. Brandy took her children to school. Shortly after she returned, Detectives Brinkley and Hall knocked on her door. She testified that she never heard Dallas say that the rifles were in the trunk of the Hyundai, or that she would help the detectives retrieve the weapons. She also testified that she never talked to Detective Brinkley about impounding the car, and never requested that he leave the car so that Nettie could use it.

## DISCUSSION

Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924. [DE-1]. He argues, in his motion to suppress, that the police violated his Fourth Amendment right to remain free of unreasonable searches and seizures when they searched the car that he had been driving, but which belonged to his mother, Nettie Dallas. Accordingly, Defendant contends that the evidence obtained from the search of the car should be suppressed.

The Fourth Amendment to the United States Constitution guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." " U.S. Const., amd. IV. Generally, this fundamental right is safeguarded by requiring the police to obtain a warrant from an independent judicial officer before conducting a search. California v. Carney, 471 U.S. 386, 390 (1985).

However, there are certain exceptions to the warrant requirement. Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Maryland v. Dyson, 527 U.S. 465, 466 (1999) (per curiam) (internal

quotations omitted). Here, Dallas' car falls within the "automobile exception."

A. Mobile

The Supreme Court has held that an automobile is mobile if it can be driven and is licensed to operate on public streets. California v. Carney, 471 U.S. 386, 393 (1985). This is true, even when the automobile in question is a mobile home. Id. In the Fourth Circuit, a car is considered mobile if it is "clearly operational." United States v. Brookins, 345 F.3d 231, 238 (4th Cir. 2003). In Brookins, the district court concluded that an automobile was not mobile because it was unoccupied and could easily have been blocked by officers so that it could not have been driven away. The Fourth Circuit rejected that argument, concluding it was enough that the car could be driven. Id. at 237 n.7 (noting that "we view ready mobility as defining the nature of the use of the vehicle, rather than its ability to be moved by a defendant upon stop or seizure). The fact that no one was in the car, that it was parked on private property, or that it could have been blocked by police did not affect the car's mobility.

Here, the Hyundai was mobile under the Supreme Court and Fourth Circuit precedent. The detectives learned from Blackwell Jr. that he had been driving in the Hyundai with Dallas and Blackwell Sr. on the night of January 10, 2008, and into the morning of January 11, 2008. The detectives also learned from Blackwell Jr. that after shooting Blackwell Sr., Dallas fled the scene in the Hyundai. When the detectives arrived at Brandy's house, they saw the Hyundai parked in her driveway. Accordingly, the Hyundai was "clearly operational," and therefore mobile. However, for the automobile exception to apply, there must also be probable cause to believe that a search of the Hyundai would uncover contraband or evidence of a crime.

7

Case 5:08-cr-00217-FL   Document 28   Filed 01/13/09   Page 7 of 13

B. <u>Probable Cause</u>

Under the automobile exception to the warrant requirement, the police do not need to have a warrant to search a vehicle when "there is probable cause to believe that the search will uncover contraband or evidence of a crime." <u>Dyson</u>, 527 U.S. at 467 (1999) (holding that there need not be an exigency for the automobile exception to apply). In fact, if a court finds "abundant probable cause" that the car contained evidence of wrongdoing, that finding alone satisfies the automobile exception. <u>Id.</u> Determining whether probable cause exists involves "a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Here, probable cause existed for the police to believe that a search of the Hyundai would reveal evidence of a crime. Detectives Brinkley and Hill knew that Blackwell Sr. had been shot. Blackwell Jr. told the detectives that Dallas shot Blackwell Sr. In addition, Blackwell Jr. told Detective Hill that Dallas shot Blackwell Sr. with a rifle that he had stolen from an abandoned car in Brandy's backyard, and that he planned to sell the rifles for drugs. Finally, Blackwell Jr. told Officer Hill that after shooting Blackwell Sr. with one of the rifles, Dallas put the rifles back in the Hyundai and drove off. When Detectives Brinkley and Hill arrived at Brandy's house, they saw the Hyundai parked in her driveway. They went inside, with permission from Brandy. Brandy told the detectives about the weapons in her home, none of which matched the description of the rifles for which Detective Brinkley was looking. The detectives located Dallas in a bedroom. Dallas was lying on the bed, and was unresponsive to questioning. Detective Brinkley secured Dallas' hands, and noticed that Dallas was injured. When Detective Brinkley went outside to look at the

8

Hyundai, he noticed blood splatter on the back fender of the car, near the trunk, and also on the driver side door. Detective Brinkley testified that in his experience, blood splatter on the back fender of a car, with no blood splatter on the outside of the trunk itself, indicates that someone, who was injured and bleeding, opened the trunk, and was leaning over the trunk.

Accordingly, when Detective Brinkley told CSI Ramsden to search the Hyundai, he knew that the last time the rifles had been seen was with Dallas in the car. He knew that an initial search of Brandy's home had not turned up the rifles. He knew that there was blood splatter on the outside of the Hyundai that was consistent with someone leaning over the trunk. This evidence, in the aggregate, was sufficient to give Detective Brinkley probable cause to believe that the Hyundai held evidence of a crime, namely the rifles that had been stolen from Brandy's backyard, and used by Dallas to shoot Blackwell Sr.

Defense counsel argues that the current case is the same as Coolidge v. New Hampshire, in which a plurality of the Supreme Court held that the automobile exception was inapplicable. 403 U.S. 443 (1971). However, Coolidge is distinguishable. In Coolidge, police suspected a defendant of kidnaping and killing a child. Id. at 445. The defendant was under suspicion for weeks and was eventually arrested over a month after the murder. Id. at 447. The police searched his car, which was parked in his driveway, without a valid warrant. Id. at 449. The plurality held that the automobile exception did not apply for a number of reasons. Id. at 462. First, the police had known for a long time about the probable role that the car played in the murder, but the search took place over a month after the murder, which would have provided the defendant ample opportunity to destroy evidence. Id. Second, "[t]here is no suggestion that, on the night in question, the

9

car was being used for any illegal purpose." Id. Third, the police were searching for fibers, and other evidence that the child had been in the defendant's car, and those objects "were neither stolen nor contraband nor dangerous." Id. Finally, the police arrested the defendant, told his wife that she could not use the car, and drove her to a relative's house. Accordingly, there was no one who could conceivably have gained access to the car. Id. at 460.

Dallas' case is very different. First, the time that elapsed from the shooting, to the search of the car was under four hours. Blackwell Jr. estimated that the shooting took place around 5:00 am on January 11, 2008. CSI Ramsden arrived at Brandy's house to conduct the search of the Hyundai at approximately 8:47 am on January 11, 2008. Accordingly, this is not a situation where weeks had elapsed between the crime and the search of the car, making it more likely that evidence would have been destroyed.

Second, Detective Brinkley had every indication that on the night in question, the car was being used for illegal purposes. Blackwell Jr. told Detective Hill that Dallas had taken the guns from Brandy's backyard. He stated that Dallas' purpose for stealing the guns was to sell them for drugs. In addition, Blackwell Jr. told Detective Hill that Dallas had shot Blackwell Sr., then fled from the scene with the rifles in the Hyundai.

Third, the objects that Detective Brinkley hoped to recover from the Hyundai were stolen and dangerous. According to Blackwell Jr.'s statement to Detective Hill, Dallas stole the rifles from an abandoned vehicle on Brandy's property. Moreover, the rifles were clearly dangerous, and functional, as Blackwell Sr. had been shot with one.

Fourth, the car in question did not belong to Dallas. Accordingly, presumably other people had keys and access to the car. This is not a situation where, as in Coolidge, the

car was parked in the defendant's driveway and the only two people with access to the car, the defendant and his wife, could not approach the car. Brandy, Nettie, or someone else could have easily driven the Hyundai away, as the car did not belong to Dallas.

Defense counsel also argues that United States v. Bradshaw, in which the Fourth Circuit held that the automobile exception did not apply, pertains to this case. 490 F.2d 1097 (4th Cir. 1974). Again, Bradshaw is distinguishable. In Bradshaw, police officers were conducting surveillance around the perimeter of the defendant's home to determine if he was illegal brewing alcohol. Id. at 1099. They were seen by the defendant and so knocked on the defendant's door, when the defendant did not respond, they walked around to the back of the house. Id. In doing so, they passed a 1952 Ford truck that "exuded a strong odor of moonshine whiskey." Id. An agent then stopped at the rear of the truck, looked through a crack in the back swinging doors, and saw bottles with clear liquid in them. Id. In determining that the automobile exception did not apply, the court relied on Coolidge and noted that "absent entirely from this situation are any of the facts indicating risk of loss of evidence." Id. at 1102.

As discussed above, in Dallas' case, there was some risk of loss of evidence because the Hyundai did not belong to Dallas. Accordingly, Nettie, the owner of the vehicle, could have come to collect the car, asked her niece, Brandy, to bring her the car, or given someone else permission to drive the car. Moreover, Bradshaw seems to suggest the need for exigent circumstances, before an automobile exception applies. However, the Supreme Court, and the Fourth Circuit, in more recent cases, have expressly disavowed the need for a showing of exigent circumstances in order for the automobile exception to apply. See Dyson, 527 U.S. at 467 (noting that "the 'automobile exception' has no

separate exigency requirement"); Brookins, 345 F.3d at 237-38 (refusing to require exigent circumstances in order for the automobile exception to apply, in light of Dyson).

Newer Fourth Circuit precedent, such as Brookins, does not even mention Bradshaw. It is the court's opinion that Brookins provides an analogous situation to Dallas'. In Brookins, officers were led on a high speed chase by the defendant's wife, after officers pursued her husband, who was outside of the car and looked to be selling drugs. 345 F.3d at 234. The police located the car approximately 15 minutes later, it was unoccupied and parked in a family member's driveway. Id. The court concluded that probable cause existed to search the vehicle even though the defendant's wife had driven the car, and might have disposed of any incriminating evidence that might have been in the car. Id. at 236. The court noted that if two weeks had elapsed between the police's arrest of defendant and defendant's wife fleeing the scene, then the court would have little trouble in concluding that probable cause had become stale. Id.

Dallas' case does not present a two week delay, but rather a less than four hour delay between the criminal conduct and the police search of the vehicle. In fact, the police located the vehicle approximately 3 hours after the shooting. Moreover, the police had an eyewitness account that Dallas put the guns back in the Hyundai before leaving the scene, and blood splatter was visible on the back bumper and driver's side door. Accordingly, it is the court's opinion that Detective Brinkley had probable cause to believe that "given all the circumstances . . . there [was] a fair probability that contraband or evidence of a crime [would] be found" in the Hyundai. Gates, 462 U.S. at 238 (emphasis added).

## CONCLUSION

For the reasons set forth above, the court **RECOMMENDS** that Defendant's Motion

to Suppress be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This 10th day of January 2009.

DAVID W. DANIEL
United States Magistrate Judge